**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Glenn L. SIKORA, Defendant-Appellant.**

**No. 79–5189.**

United States Court of Appeals,
Sixth Circuit.

July 21, 1980.

Certiorari Denied Nov. 17, 1980.
See 101 S.Ct. 530.

N. C. Deday LaRene, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Christopher A. Andreoff, Francis L. Zebot, Asst. U. S. Attys., Detroit, Mich., for plaintiff-appellee.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge and WISEMAN,* District Judge.

ORDER

On receipt and consideration of an appeal in the above-styled case and after consideration of the briefs, record and oral arguments; and

■ Finding from this record no legal or constitutional basis for appellant's contention that certain incriminating physical and oral evidence should have been suppressed, since appellant at the times concerned was neither in custody (*see Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)), nor had adversary proceedings been started against him (*see Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977)); and

Further finding no abuse of discretion in the District Judge's admission of an otherwise admissible tape recording on the grounds that portions thereof were inaudible; and

■ Further finding no violation of Rule 11(e)(6) of the Federal Rules of Criminal Procedure, there having been no plea of guilty tendered by appellant, no proposal of

* Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of  Tennessee, sitting by designation.

such a plea made by the United States, and no proposal to negotiate such a plea made by appellant Sikora; and

■ Further finding, if the comments made by appellant could be construed as plea negotiations, that the admission of these comments in this trial could be nothing other than harmless error when considered against the totality of the clearly admissible evidence,

Now, therefore, the judgment of conviction is hereby affirmed.

WISEMAN, District Judge, concurring in part and dissenting in part.

I respectfully dissent. I would hold that: (1) Rule 410, F.R.Evid., and its counterpart, F.R.Crim.P. 11(e)(6), bar the government's use of Sikora's statements to Agent Rassey on May 24, 1978; and (2) *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), requires the suppression of the physical evidence obtained by the secret agent Ajoian shortly after May 24, as well as Sikora's incriminating statements elicited and recorded by Ajoian on June 14, 1978. Because the admission of the evidence obtained by Ajoian was harmless beyond a reasonable doubt in regard to Counts Thirteen through Sixteen of the sixteen-count indictment, I would affirm Sikora's convictions on those counts. The error was not harmless in regard to the first twelve counts, however, and Sikora's convictions on those charges should be reversed and remanded.

I.

On July 25, 1978, a federal grand jury in Detroit returned a sixteen-count indictment against the appellant, Glenn Sikora. Eight counts alleged possession with intent to distribute cocaine, while the remaining eight counts alleged the actual distribution of this controlled substance, all in violation of 21 U.S.C. § 841(a)(1). Sikora was convicted of all counts in a bench trial before the Honorable Julian Cook, and was sentenced to eight eight-year terms, to be served concurrently.

For the purposes of this appeal, Sikora's legal problems began on May 24, 1978, when Agent Rassey of the DEA arranged a surprise visit with Sikora in the office of his federal probation officer. (Sikora was on probation for a previous cocaine-related conviction). Rassey's meeting with Sikora had earlier been authorized by Assistant United States Attorney Andreoff at a meeting with Rassey, during which they had discussed the desirability of obtaining Sikora's cooperation with the DEA. (App. 72–73). Agent Rassey, who had been investigating Sikora for some time, informed him that in his opinion, "we had enough evidence to indict and convict him (App. 74)," and that "it would be in his best interest" to cooperate with the DEA. Otherwise, "the chance of him receiving a severe sentence was very possible." (App. 74). At his meeting with Sikora, Rassey, after suggesting to Sikora that it would be in his best interest to cooperate, advised Sikora that he should consult with an attorney. He then told Sikora to take a week to think about cooperation. (App. 77). At this time, Sikora had neither been arrested nor indicted on any charges.

Instead of waiting a week, Sikora, visibly distressed by what Rassey had told him (App. 79–80), went downstairs to Rassey's office after concluding his interview with Probation Officer Briscoe. Sikora wanted to know what type of cooperation the government wanted, and what he would have to do. (App. 79–80). Rassey indicated that he was interested in people dealing in pounds of cocaine, to which Sikora responded, "I've got two or three people or a group of people who offer me pounds; which one do you want?" (App. 80). Rassey stated that he did not want to discuss any names until he was assured of Sikora's cooperation, to which Sikora replied, "I know who you want." Sikora unsuccessfully moved to suppress these statements prior to trial, and he now appeals the lower court's decision to admit these incriminating statements.

After the second meeting with Sikora, Rassey called Edward Ajoian, a long-time friend of Sikora's, who was now cooperat-

ing with the DEA in its investigation of the appellant. Ajoian had begun cooperating with the DEA after his own arrest on drug charges in November 1977, and he had already participated in two government-supervised "controlled buys" of cocaine from Sikora. Rassey told Ajoian about his confrontation with Sikora, and asked Ajoian to let him know "if anything happened or if Mr. Sikora said anything." (App. 88). Shortly thereafter, Ajoian had a telephone conversation with Sikora, although it is unclear which of the two placed the call. (App. 99). Sikora told him about his meeting with Rassey, and stated that he wanted to get rid of some scales and other narcotics paraphernalia. At some point over the long Memorial Day weekend following May 24, Ajoian went to Sikora's home and picked up a duffel bag containing the scales. Within "a couple days," Ajoian called Rassey to tell him about the scales and Rassey later paid Ajoian $150 for them.

On June 14, Ajoian went back to Sikora's home to tell him that he had disposed of the scales. Ajoian was "wired" with a body transmitter, and it successfully recorded Sikora's numerous incriminating statements. Sikora moved to suppress both the scales and recorded statements, but that motion was also denied, thereby giving rise to the second issue addressed below.

Prior to June 14, Sikora's attorney, Mr. LaRene, had engaged in discussions with Assistant United States Attorney Andreoff and Agent Rassey about the terms of Sikora's possible cooperation. Sikora ultimately decided not to cooperate, but it is clear that negotiations were still in progress on June 14, the date Ajoian elicited the recorded statements at issue. (App. 91–92).

## II.

F.R.Evid. 410 provides that statements made in connection with and relevant to an offer to plead guilty to any crime are not admissible against the person who made them. In the instant case, it is clear that on May 24, the government offered Sikora a plea to reduced charges (or perhaps, no charges at all) in return for his cooperation

in netting bigger cocaine dealers. The crucial finding in this case is that the government, through Assistant United States Attorney Andreoff, had initiated the plea bargaining process prior to May 24. At the evidentiary hearing (App. 71–74), Agent Rassey, under direct examination by Andreoff, told of a pre-May 24 meeting in which Andreoff and Rassey discussed their feeling that Sikora

> was in a position which (sic) he might be interested in cooperation, that if he did cooperate—that if there had been a lot of cooperation that would be valuable to the DEA, and that if he decided to cooperate it would be in his interest and the government's interest for him to decide that before he was formally indicted.

(App. 72–73).

Although this conversation was couched in terms of "cooperation" and apparently did not deal with specific plea proposals, it is clear that Andreoff and Agent Rassey were discussing the initial stages of plea bargaining with Sikora. Surely they did not expect to obtain Sikora's cooperation in return for nothing, and the only thing the government could offer, so far as the record discloses, was a plea to reduced charges (or possibly no charges at all). There is also no doubt that Andreoff authorized Agent Rassey to make the initial overtures to Sikora at the May 24 meeting; as Rassey testified, "[a]fter discussing [it] with you, it was decided that I should meet with Sikora." (App. 71).

The government has argued that Rassey was engaged in "investigation" rather than plea bargaining when he met with Sikora in Probation Officer Briscoe's office, Brief for Appellee 24, but the testimony of Rassey shows beyond any serious doubt that he was engaged in the early stages of negotiation. If Rassey was in fact investigating Sikora on May 24, it is difficult to understand his confidence that Miranda warnings were not necessary during their two meetings on that date. (See App. 75–76; 80–81). To quote Rassey again, "I didn't want to ask him any questions, I just wanted to inform him of his situation, and I wanted him to

think about it and make a decision." (App. 76). This is not the essence of investigation; it is, rather, the beginning of plea negotiations, at least in the case when an Assistant United States Attorney has expressly authorized a law enforcement agent to initiate the plea bargaining process. *See United States v. Grant*, 622 F.2d 308 (8th Cir. 1980). Because this is the situation presented in the instant case, I am convinced that plea bargaining began when Agent Rassey first met with Sikora in Probation Officer Briscoe's office on the morning of May 24.

The incriminating statements at issue were not made until Sikora went down to talk with Agent Rassey approximately one-half hour after their first meeting. (App. 79). The government attributes great significance to the fact that Sikora initiated the second meeting, Brief for Appellee 24, but that fact in no way supports the government's position, because it is clear that Sikora set up this second meeting so he could discuss the offer that Rassey had presented to him. Rassey, of course, intended that Sikora discuss the possibility of "cooperation" with him, although he had suggested that Sikora "could have a week." (App. 77).

The government's conduct of telling a prospective defendant that it wants to discuss "cooperation" with him (i. e., plea bargaining in return for information) and then using the defendant's part of the discussion against him is totally repugnant, as the drafters of Rule 410 realized. Indeed, this conduct is so fundamentally unfair that it probably constitutes a violation of Fifth Amendment substantive due process. The government placed Sikora in a position where he could either talk about cooperation and risk having his statements used against him, or he could refuse to talk and risk facing the full wrath of the United States Attorney's office. Although Sikora's statements were, in a strict sense, voluntary, it is shameful for the government to penalize an individual for statements made in a good faith attempt to respond to overtures initiated by the government. *See United States v. Ross*, 493 F.2d 771, 775 (5th

Cir. 1974). It is not necessary to hold that the Fifth Amendment requires the suppression of Sikora's statements, however, because Rule 410 is clear enough.

This Circuit has held that even statements made in "an attempt to open plea bargaining" are inadmissible. *United States v. Brooks*, 536 F.2d 1137, 1139 (6th Cir. 1976) (Edwards, J.). In *Brooks*, the defendant in a mail theft case telephoned the postal inspector in charge of the investigation and offered to plead guilty if he were given a maximum sentence of two years. This Court held that the inspector's testimony about this telephone call was inadmissible, citing F.R.Crim.P. 11(e)(6) as persuasive authority, although it was not in effect at the time of trial. *Brooks* requires the suppression of Sikora's statements to Rassey, because they were made in response to the government's opening of plea bargaining. Sikora's statements were not part of a definite offer to plead, unlike those of the *Brooks* defendant, but that distinction is immaterial because Sikora's statements were in response to plea bargaining overtures initiated by the government. Requiring a defendant to show a definite intent to plead guilty in order to be protected by Rule 410 may be a sensible requirement when a defendant is seeking to suppress statements made in a discussion *initiated by him*, but that is not what occurred in the instant case. *See United States v. Geders*, 585 F.2d 1303 (5th Cir. 1978). This is a case in which the government proposed an offer to the defendant (though not in final form), and consequently any statements made by Sikora while discussing the proposal are inadmissible because they are "made in connection with, and relevant to . . . an offer to plead guilty." There is no reason why the government cannot be the party making the "offer" contemplated by the Rule, as the Eighth Circuit recognized in the recent case of *United States v. Grant, supra* (FBI agent extended offer to plead during pre-indictment interview).

Because the statements in *Brooks* were made to a law enforcement officer who had no authority to negotiate a plea agreement,

*Brooks* has been criticized as extending the coverage of Rule 410 too far, and it has served as an impetus for amending Rule 410 so that only statements to prosecuting attorneys are covered. Act of July 31, 1979, Pub.L.No.96–42, 93 Stat. 326; *see* Advisory Committee Notes to Proposed Amendments to Rule 410, reprinted in 2 J. Weinstein, Evidence 132–36 (Supp.1979). In the instant case, however, Sikora was rationally responding to an offer made by a government agent who was empowered by an Assistant United States Attorney to begin plea negotiations; therefore, even if the Sixth Circuit were to retreat from the *Brooks* holding in light of the proposed amendment to Rule 410, that step would not benefit the government in this case. *See Grant, supra.*

The case law cited by both parties is not particularly helpful, because none of the cases cited present situations in which the evidence clearly shows that the government had initiated plea bargaining when the defendants made the incriminating statements at issue. Consequently, the primary issue in these cases is whether the defendant had initiated plea bargaining, or whether the statements were simply admissions made during the investigation. Rule 410 was not intended to exclude statements made to law enforcement officers during the investigatory stage of a criminal case, *see* Advisory Committee Notes to Proposed Amendments to Rule 410, *supra*, and defendants should not be permitted to retroactively convert genuine admissions into offers to plead. *See* 2 Weinstein, *supra*, ¶ 410[07] (main text). However, that danger is not present in the instant case, because the record clearly shows that the *government* started the plea bargaining process, and Sikora was merely responding to the government's overtures when he made the incriminating statements at issue. Consequently, this case does not present the potential for abuse feared by Weinstein and the Advisory Committee, because the objective facts, as disclosed by the government's own witness, Rassey, disclose that plea bargaining was indeed in progress.

The case most on point is a recent Eighth Circuit decision, *United States v. Grant, supra.* In *Grant*, an FBI agent requested an interview with Grant, a county judge, in regard to a kickback scheme that was the target of government investigators. Grant, who had neither been arrested nor indicted, agreed to the meeting, and made several incriminating statements. At some point during the interview, the FBI agent offered Grant a plea to a one-count indictment in return for his cooperation. The United States Attorney had previously authorized the agent to make this offer, although it was a rather unusual procedure. Grant neither accepted nor rejected the offer, but responded that he wanted to explore the plea bargain with the United States Attorney.

The court held that the statements made during this interview were inadmissible under Rule 410, even though it was unclear whether the incriminating statements preceded or followed the plea offer. Judge Hunter was careful to explain that, ordinarily, incriminating statements to FBI agents could not be a part of plea bargaining, but he carved out an exception for those relatively rare cases when the agent is acting with express authority from a government attorney. Because the FBI agent in *Grant* was acting under the United States Attorney's authority when he made the plea offer, the statements made by Grant in response were inadmissible.

The reasoning of the Eighth Circuit is most persuasive, and should be applied to this case. The only significant factual distinction between the two cases is that the FBI agent in *Grant* was authorized to make a definite offer, while Agent Rassey was only authorized to commence negotiations. This is a distinction without a difference, however, because plea bargaining is still plea bargaining even though the government has not decided on its specific offer. To decide otherwise would allow the government to circumvent Rule 410 by the simple device of being vague. I am persuaded by the Eighth Circuit's analysis in *Grant*, and I believe its application to the instant case leads to the conclusion that

Sikora's May 24 statements to Rassey should be suppressed.[1]

### III.

I also dissent from the panel's holding that evidence of the June 14 conversation between Sikora and the informer Ajoian was admissible, as well as its holding that the scales obtained by Ajoian at some point during the long weekend of May 25–27 were admissible. Although the majority has concluded that Sikora's Sixth Amendment right to counsel had not attached as of June 14, it is my opinion that the right to counsel attached when plea negotiations began on May 24, the date when Agent Rassey approached Sikora with the initial overtures of plea negotiations.[2] Moreover, even if the majority rejects the proposition that plea negotiations began on May 24, there is no doubt that plea negotiations were in progress on June 14, the date on which Ajoian, the government's "wired" secret agent, elicited the incriminating statements at issue from Sikora. (App. 84–85; 91–92).

Once it is established that Sikora's Sixth Amendment rights came into effect prior to June 14, *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), forbids the government's use at trial of the statements elicited from Sikora. *Massiah*'s operative facts are virtually identical to those of the instant case; in both cases, confederates of the defendant became government agents and elicited incriminating statements from their former friends.

The government insists that *Massiah* is not controlling, because, unlike *Massiah*, Sikora had not been arrested or indicted, and thus he was not protected by the Sixth Amendment. That argument should be rejected, however, because the commencement of plea negotiations triggered Sikora's Sixth Amendment rights in the same manner, and for the same reasons, that arrest or indictment would have.

There should be no cause for alarm at the prospect of potential criminal defendants enjoying Sixth Amendment rights during plea negotiations. As a practical matter, it may be assumed that virtually all persons who enter into plea negotiations with the government are protected by counsel, because in most cases judicial proceedings would have begun before plea negotiations commence, and therefore the right to counsel would have already attached. As the Supreme Court stated in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the right to counsel means "*at least* that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" 430 U.S. at 398, 97 S.Ct. at 1239 (emphasis added), *quoting Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

This case presents a variation on the normal course of criminal proceedings, because plea negotiations between the United

---

1. This error was not of constitutional magnitude, and thus the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), is inapplicable. The error would be reversible only if, in context, it had a substantial impact on the decision of the fact finder. *See United States v. Archbold-Newball*, 554 F.2d 665, 680 (5th Cir.), *cert. denied sub nom. Romirez-Betancourt v. United States*, 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977). I cannot conclude that Sikora's statements to Rassey had such an impact, particularly since the case was tried to the district judge, and therefore I would not hold that the admission of these statements was reversible error.

2. *Massiah* prohibits the government from "deliberately eliciting" incriminating information from a suspect after his Sixth Amendment rights have attached. *See Rhode Island v. Innis*, 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297 (1980). Consequently, Sikora's May 24 statements were not obtained in violation of *Massiah*, because even though Sikora's Sixth Amendment rights attached when Rassey first approached him, Agent Rassey was not attempting to elicit information from Sikora when Sikora made his self-initiated visit to the DEA office. As I have tried to demonstrate in Part II, *supra*, Rassey was negotiating with Sikora on May 24, and not deliberately attempting to elicit incriminating statements. (*See* App. 76). Ajoian, on the other hand, was deliberately eliciting incriminating statements from Sikora on June 14, and thus the *Massiah* prohibition applies.

States Attorney's office and the defendant began even before Sikora had been formally charged. The government cites *Kirby* and *Brewer* in support of its argument that no right to counsel attaches until the beginning of adversary judicial proceedings, a point which the government identifies as the time of arrest. *See* Brief for Appellee 18. In the majority of cases, the arrest does in fact mark the beginning of adversary proceedings, and is not "a mere formalism," *Kirby v. Illinois*, 406 U.S. at 689, 92 S.Ct. at 1882, that provides the triggering mechanism for Sixth Amendment rights. However, it is important to note that the *Kirby* plurality[3] identified the initiation of judicial proceedings as the point when the government has committed itself to prosecute, and the adverse positions of the parties have solidified. "It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id.* If in fact the adverse positions of the parties have solidified at some point earlier than arrest and the defendant has been "faced with the prosecutorial forces" of the government, *Kirby* clearly suggests that the right to counsel attaches at that point, despite the absence of "formal" procedures.[4]

In the instant case, Sikora's right to counsel was in effect on June 14, because it is obvious that prior to that date, the government had made a commitment to prosecute him. This finding is based on the fact that the government had entered into plea negotiations with Sikora, the government's agent being Assistant United States Attorney Andreoff. (App. 91–92). Once the government enters into plea bargaining, it is apparent that the adverse positions of the parties have solidified, and the prospective defendant is plainly faced with the prosecutorial powers of the government. Conse-

quently, the right to counsel should begin with the commencement of plea bargaining in those rather unusual cases where plea bargaining precedes formal charges.

Plea bargaining is most emphatically a "critical stage" of the prosecution, because a defendant who enters plea bargaining might well surrender the most fundamental right of all—the right to trial itself. *See Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). The accused "requires the guiding hand of counsel," *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932), to ensure that he does not lightly surrender that most basic protection of the Anglo-American system of justice. In *United States v. Ash*, 413 U.S. 300, 313, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973), Justice Blackmun wrote for a majority of the court that the test for the attachment of the right to counsel requires a determination of whether the accused needs aid in coping with legal problems or assistance in meeting his adversary. Plea bargaining situations easily satisfy both prongs of this two-part test. The accused might well be ignorant of defenses against the contemplated charges, and as the Court stated in *Hamilton v. Alabama*, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961), "[o]nly the presence of counsel [enables the] accused to know all the defenses available to him and to plead intelligently." The layman's peril is magnified because the government is represented by "experienced and learned counsel," *Johnson v. Zerbst*, 304 U.S. 458, 462–63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938), whose plea negotiating skills may so far surpass those of the defendant's that overreaching, intentional or otherwise, is a distinct possibility. Consequently, the lay defendant should not be expected to undergo the plea bargaining process alone, because the same dangers

---

**3.** The *Kirby* plurality opinion can be considered as a holding that the right to counsel attaches *no later than* the initiation of judicial proceedings such as a formal charge, because the dissenters (Justices Brennan, Marshall, and Douglas) would have attached the right to counsel at an even earlier stage.

**4.** Because plea bargaining is now regulated by Rule 11, F.R.Crim.P., which gives the district judge ultimate supervision over plea bargains, I think a strong argument can be made for the proposition that plea bargaining is itself a judicial proceeding in the sense contemplated by *Kirby*.

that require counsel at other stages apply just as forcefully in the plea bargaining context.[5]

The Court recognized that the right to counsel has evolved to reflect changing patterns of criminal procedure. 413 U.S. at 310, 93 S.Ct. at 2575. The Court has extended the right in new contexts that present the same dangers that gave rise to the right originally, those dangers being confrontation with the procedural system, the expert prosecutor, or both. In the plea bargaining context, the accused is presented with both of these dangers, and therefore those persons who enter the plea bargaining process before formal charges have been filed should have the protection of the Sixth Amendment.

It should be emphasized again that this is not a major or even a particularly significant extension of Sixth Amendment protection, because in most cases formal proceedings would have begun before plea bargaining commences. However, when the government begins plea negotiations with a citizen who has not been formally charged, he is just as surely faced with the "prosecutorial forces of organized society" as the defendant who has been formally introduced into the system. For this reason, I conclude that Sikora's right to counsel had attached prior to June 14, the date when the government's agent, Ajoian, successfully elicited incriminating statements from him. For that reason, Sikora's June 14 statements should have been suppressed.[6]

I would further hold that the scales obtained by Ajoian sometime during the Memorial Day weekend of May 25–27, 1978, should also have been suppressed. This conclusion is based on the finding that Sikora's right to counsel attached on Friday, May 24, the date when Agent Rassey approached Sikora to discuss the possibility of "cooperation." *Massiah* prohibits the government from deliberately eliciting "incriminating information" from a defendant after the attachment of the right to counsel. *See Rhode Island v. Innis,* 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297. The record shows that Ajoian was actively engaged in his ongoing efforts to elicit incriminating information from Sikora at the time he obtained the scales. (App. 87–88; 99–102). Because the physical evidence at issue was the fruit of Ajoian's elicitation of incriminating information from Sikora after Sikora's right to counsel had attached, *Massiah* requires its suppression.

## IV.

Without the evidence that I conclude should have been suppressed, only the stipulated testimony of Ajoian supported Sikora's conviction on Counts One through Twelve of the sixteen-count indictment. Ajoian was under intense pressure to cooperate with the government (App. 105–08), and his credibility is subject to serious question. Consequently, I conclude that the admission of the tainted evidence was not harmless beyond a reasonable doubt in re-

---

5. The potential prejudice is not remedied by offering the assistance of counsel to the defendant when he appears before the court to make his guilty plea. By that time, the government may have so strengthened its case through information obtained during plea negotiations that a change of plea would be unwise, regardless of how inadvisable the plea bargain was. In order to protect his rights and ensure that the defendant does not, for example, plead to an offense of which he may be innocent, counsel is required from the outset of plea negotiations. Any system that would usher in counsel at the last minute and present him or her with a fait accompli substantially negotiated by the defendant makes a mockery of the right to counsel articulated in F.R.Crim.P. 11(c)(2), as well as the Sixth Amendment right to counsel.

6. *Massiah* prohibits government agents from "deliberately eliciting" incriminating information from a defendant in the absence of counsel once the right to counsel has attached. I have consistently referred to Ajoian's June 14 efforts as the eliciting of information rather than interrogation, because the recent case of *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), to the extent that it might be applicable, casts some doubt on whether Ajoian was engaged in an interrogation of Sikora. *Cf.* 446 U.S. at 300 n. 4, 100 S.Ct. 1689 n. 4 (suggesting that the term "interrogation" might not be "apt" in the Sixth Amendment context).

gard to the first twelve counts, because it supplied corroboration to the testimony of Ajoian.[7] I would therefore reverse and remand Sikora's convictions on those counts.

The last four counts were based on government-supervised "controlled buys" by Ajoian from Sikora, and the testimony of Agent Rassey in regard to those buys is most damaging, far more damaging than any of the evidence I would exclude. Consequently, as to Counts Thirteen through Sixteen, I am persuaded that the admission of the tainted evidence was harmless error beyond a reasonable doubt, and the convictions on those counts should be affirmed.

7. This conclusion is based on the admission of the June 14 tapes alone. In other words, even if the scales were admissible (e. g., because the right to counsel had not attached on May 24), I would conclude that the recorded conversations were sufficiently prejudical to overcome a finding of harmless error.