APPEL, Justice
(dissenting).
I respectfully dissent from the result in this case.
I. Factual Background.
■The material facts are straightforward and undisputed. Senn was stopped by police officer Brian Cuppy during the early morning hours of September 1, 2014. Cuppy initiated the stop because Senn failed to bring his vehicle to a stop in front of an intersection but came to a stop well past the crosswalk. After the stop, Cuppy believed Senn displayed signs of intoxication, administered field sobriety tests, and concluded that Senn plight be under the influence of alcohol. Cuppy arrested Senn and took him.to the police station for chemical testing.
-At the station, Cuppy took Senn into a DataMaster breath alcohol testing room and read the implied-consent advisory to him. Cuppy also read Senn his rights under Iowa Code section 804.20. This Code provision provides, in relevant part,
Any peace officer or other person having custody of any person arrested or restrained of the person’s liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member' of the person’s family or an attorney of the person’s choice, or both— If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained.... An attorney shall be permitted to see: and consult confidentially with such 'person- -alone and in private at the jail or other place of custody without unreasonable delay.
Iowa Code'§ 804.20 (2013).
Senn invoked his right to call an attorney. Senn was able to reach his attorney and began talking with counsel. Officer Cuppy was a few feet away. Senn told Cuppy he wished to have “attorney-client” ■privilege, but Officer Cuppy stated Senn could not have that privilege while on the phone call and could only do so if the attorney was there in person. Cuppy refused to allow Senn privacy in his conversation with his attorney. As a result, Senn and his attorney largely communicated through yes-or-no questions.
Senn requested his attorney come to the station to aid him in determining whether to submit to testing. Cuppy overheard that-request and advised Senn that he only had thirty-two minutes.left, to have a private conversation with his lawyer. Senn continued to make potentially incriminating statements to his lawyer within earshot of Cuppy and the video recording device located in the room. Senn’s lawyer told hipi that she could not meet- with him within the prescribed time limit. Senn *51 began an attempt to contact other lawyers but was unsuccessful.
Senn’s consultation time expired, and Cuppy requested Senn submit to' a breath test.1 He did so and provided a breath sample revealing a blood alcohol content of .140 percent. He was subsequently transported to the Polk County Jail. Senn was charged with first offense operating a motor vehicle while under the influence in violation of Iowa Code section 321J.2. Senn pled not guilty. He filed a motion to suppress the testing results. ¡ Among other things, he claimed the test result was obtained in violation of his right to have a private telephonic conference with his counsel.
The district court denied the motion to suppress. According to the district court, Senn’s right to counsel had not attached as the officer was investigating a charge of operating a motor vehicle while intoxicated (OWI). The district court also noted that Cuppy never interrogated Senn. Senn was subsequently tried-on the minutes and found guilty of OWI.
Senn appeals.
II. Standard of Review.
We review questions qf constitutional interpretation de novo. State v. Gaskins, 866 N.W.2d 1, 5 (Iowa- 2015); State v. Baldón, 829 N.W.2d 785, 789 (Iowa 2013); State v. Pals, 805:N.W.2d 767, 771 (Iowa 2011).
III. Attachment of Right to Counsel in “All Criminal Prosecutions” in Federal and State Courts.
A. United States Constitution: Functional vs. Formal Analysis. The Sixth Amendment provides that “[i]n all criminal prosecutions the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” U.S. Const, amend. VI. As is often the case with constitutional provisions, the language is general and at least somewhat open-ended. Obviously, the provision must mean at the very least that there is a right to the assistance-of counsel at1 trial.
But if the- right to counsel is to mean anything, must it not apply beyond the trial itself? Does the constitutional right to counsel apply to ensure assistance that functionally suffices to protect defendants, or does it apply only in certain and specific formal proceedings? These are the questions posed in the famous Scottsboro case, Powell v. Alabama, -287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). In Powell, lawyers were appointed on the day of trial to represent the defendants, but the Supreme Court found that such counsel was not sufficient. Id. at 56, 53 S.Ct. at 59, 77 L.Ed. at 164. Using a functional, approach, the Supreme Court determined that if the right to counsel at trial was to have any meaning, there must be a right to pretrial, counsel in order to assist in the preparation of a defense. Id. at 68-69, 53 S.Ct. at 64, 77 L.Ed. at 170-71. Although Powell relied on due process rather than the right to counsel, the functional analysis was unmistakable. Id. at 71, 53 S.Ct. at 65, 77 L.Ed. at 172; see Alan K. Austin, The Pretrial Right to Counsel, 26 Stan. L. Rev. 399, 400-02 (1974) [hereinafter Austin] (describing the functional approach to the right to counsel and tracing its origins to Powell).
The Court, used a similar functional approach in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). In Escobedo, the Supreme Court considered a case where prior to indictment, a murder suspect was held and extensively questioned at the police station. Id. at 479, 84 S.Ct. at 1759, 12 L.Ed.2d at 979. When his lawyer appeared at the police station, he was -not allowed to see his client until the interrogation was complete. Id. at 480-81, 84 S.Ct. at 1759-60,12 L.Ed.2d *52 at 979-80. During the interrogation, Es-cobedo made a number of incriminating statements to the police interrogators. Id. at 483, 84 S.Ct. at 1761, 12 L.Ed.2d at 981.
Escobedo took a functional approach to the right to counsel. Id. at 486,84 S.Ct. at 1762, 12 L.Ed.2d at 983. “It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. [The defendant] had, for all practical purposes, already been charged with murder.” Id.
The Supreme Court continued to utilize a functional approach to the right to counsel in United States v. Wade, 388 U.S. 218, 87 S.Ct; 1926, 18 L.Ed.2d 1149 (1967). In Wade,- the Supreme Court considered whether a defendant is entitled to counsel at a postindictment, pretrial lineup. Id. at 219-20, 87 S.Ct. at 1928, 18 L.Ed.2d at 1163. The government in Wade asserted that the pretrial identification was “a mere preparatory step in the gathering of the prosecution’s evidence.” Id. at 227, 87 S.Ct. at 1932,18 L.Ed.2d at 1157-58.
The United States Supreme Court disagreed. Id. at 236-37, 87 S.Ct. at 1937, 18 L.Ed.2d at 1162-63. The Wade Court emphasized that the right to counsel should extend to critical phases where the accused simply cannot effectively scrutinize evidence at trial. Id. at 227-28, 87 S.Ct. at 1932-33, 18 L.Ed.2d at 1158. In Wade, the Supreme Court focused on the language of the Sixth Amendment providing “the assistance of counsel” for the defense. Id. at 224-25, 87 S.Ct. at 1931, 18 L.Ed.2d at 1156. According to the Court, “The plain wording of this guarantee thus encompasses counsel’s assistance whenever necessary to assure a meaningful ‘de-fence.’” Id. at 225, 87 S.Ct. at 1931, 18 L.Ed.2d at 1156. Because there was the grave possibility of prejudice- in a pretrial lineup which cannot be reconstructed at trial, the Wade Court concluded that suteh a lineup was a critical stage of the prosecution where the defendant is entitled to the assistance of counsel as much as at the trial itself. Id. at 228-32, 87 S.Ct. at 1933-35.18 L.Ed.2d at 1158-60.
As in Escobedo, the Wade Court rejected formalism. See id. at 226, 87 S.Ct. at 1931-32, 18 L.Ed.2d at 1157 (stating that the right to counsel would be “a very hollow thing” if the state could conduct pretrial examinations absent defense counsel that would then assure conviction at trial, no matter what the defense did (quoting Escobedo, 378 U.S. at 487, 84 S.Ct. at 1763, 12 L.Ed.2d at 984)). As noted by Justice Brennan, “the accused ... need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel’s absence might derogate from the accused’s right to a fair trial.” Id. at 226, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157. Justice Brennan further noted that the hazards are identical regardless of whether they occur before or after the formal initiation of the adversary proceeding. Id. The test the Wade Court articled was “whether potential substantial prejudice to defendant’s rights inheres in the' particular confrontation and the ability of counsel to help avoid that prejudice.” Id. at 227, 87 S.Ct. -at 1932.18 L.Ed.2d at 1157.
In Miranda v. Arizona, the Supreme Court developed a test for attachment of rights under the Fifth Amendment. 384 U.S. 436, 439, 86 S.Ct. 1602, 1609, 16 L.Ed.2d 694, 704 (1966). While Escobedo utilized a vague “focus” test, the Miranda Court applied an objective standard of custodial interrogation. See id.' at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719; Austin, 26 Stan. L.Rev. at 402. While the Miranda case emphasized the Fifth Amendment right against self-incrimination, it is *53 clear that the Court considered the right to counsel as key to protecting Fifth Amendment rights. See 384 U.S. at 510, 86 S.Ct. at 1646, 16-L.Ed.2d at 744 (Harlan, J., dissenting) (suggesting that the majority’s reliance on the Fifth Amendment was an optical illusion and that in fact the majority was really creating new rules derived from Sixth Amendment precedent); Austin, 26 Stan. L.Rev. at 403-04 (noting that the Sixth Amendment was barely discussed in Miranda).
A changed makeup in the members of the Supreme Court, however, began to undermine the functional approach and move toward a more formalistic approach to the right to counsel. In Kirby v. Illinois, the Supreme Court considered the question of when the right to counsel attaches. 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411, 417 (1972) (plurality opinion). In that case, a plurality declined to extend the Sixth Amendment right to counsel prior to the initiation of judicial criminal proceedings. Id. at 690, 92 S.Ct. at 1882-83, 32 L.Ed.2d at 418. The Kirby plurality emphasized that it did not regard the boundary of the initiation of adversarial judicial criminal proceedings to be “a mere formalism.” Id. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d at 417-18.
Justice Brennan dissented. Id. at 691, 92 S.Ct. at 1883, 32 L.Ed.2d at 419 (Brennan, J,, dissenting). He argued that the formal initiation of proceedings was an artificial date. Id. at 698-99, 92 S.Ct. at 1887, 32 L.Ed.2d at 423. According to Justice Brennan, “identical hazards” exist from focused interrogations and lineups regardless of whether these interactions occur before or after the date of formal adversary proceedings.' Id. at 697-98,. 92 S.Ct. at 1886-87, 32 L.Ed.2d at 423.
The movement away from the functional analysis of Powell, Escobedo, and Wade continued in United States v. Gouveia, 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). In Gouveia, the Supreme Court considered a claim of deprivation of the right to counsel brought by prisoners charged with the murder of another inmate who were all held in administrative segregation during the pendency-of internal prison disciplinary proceedings.- Id. at 182-83,104 S.Ct. at 2294-95, 81 L.Ed.2d at 150-51. The United States Ninth Circuit Court of Appeals held that the right to counsel attached at that time, making an analogy to speedy trial cases where the right to a speedy trial attached at the time of arrest. Id. at 185-86,104 S.Ct. at 2295-96, 81 L.Ed.2d .at 152. The Supreme Court rejected the Ninth Circuit’s approach. Id. at 192-93, 104 S.Ct. at 2300, 81 L.Ed.2d at 157. The Gouveia majority emphasized that the right to counsel was triggered by adversary judicial proceedings, not the time of arrest. Id. at 187, 104 S.Ct. at 2297, 81 L.Ed.2d at 153.
Justice Stevens, along with Justice Brennan, concurred in the result but emphasized that the court’s new direction of analysis in right-to-counsel cases did not foreclose' the possibility that in some circumstances, the right could attach prior to formal initiation of judicial proceedings. Id. at 197-99, 104 S.Ct. at 2302-03, 81 . L.Ed.2d at 160-61 (Stevens, J.; concurring). The concurrence emphasized the Court’s prior precedents “do[] not foreclose the possibility that the right to counsel might under some circumstances attach prior to ■ the formal initiation of judicial proceedings.”- Id. at 193, 104 S.Ct. at 2300, 81 L.Ed.2d at 157. According to Justice Stevens, prior cases show that the Sixth Amendment does not turn on the formal initiation of proceedings but “rather on the nature of the confrontation between the authorities and the citizen.” Id. at - 195, 104 S.Ct. at 2301, 81 L.Ed.2d at 159. Justice Stevens concurred because he did *54 not think that administrative segregation in a prison, even under a- functional test, triggered the right to counsel. Id, at 197, 104 S.Ct., at 2302, 81 L.Ed.2d at 160. Justice Stevens’s concurrence is consistent with Miranda, which stated that custodial interrogation was the “point [at which] our adversary system of criminal proceedings commences.” Miranda, 384 U.S. at 477, 86 S.Ct. at 1629,16 L.Ed.2d at 725.
Finally, the court cohsidered whether to fully adopt the formal approach in Rothgery v. Gillespie County, 554 U.S. 191, 128 S.Ct. 2578,: 171 L.Ed.2d 366 (2008).- In Rothgery, a' former criminal defendant brought an action asserting that the comity violated his Sixth and Fourteenth Amendment rights by following a policy of denying appointed counsel to arrestees released from jail. Id, at 197, 128 S.Ct. at-2582-83, 171 L.Ed.2d at 373. Rothgery appeared before a magistrate and was told of the formal accusation against him, but the public prosecutor was not aware of the initial proceeding or involved in the initial hearing. Id. at 197-98, 128 S.Ct. at 2583, 171 L.Ed.2d at 374, The question was whether Rothgery after his initial appearance was entitled to appointed counsel at state expense. Id. at 197, 128 S.Ct. at 2583,171 L.Ed.2d at 373.
The Supreme Court held that Rothgery was entitled to appointed counsel. Id. at 213, 128 S.Ct. at 2592, 171 L,Ed.2d at 383. The Rothgery Court emphasized that after the filing of the accusation, a defendant is then faced with “ ‘the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law1 that define his capacity and control his actual ability to defend himself’ against the charge. Id. at 207,128 S.Ct. at 2589, 171 L.Ed.2d at 380 (quoting Kirby, 406 U.S. at 689, 92 S.Ct. at 1882, 32 L.Ed.2d .at 418). Nonetheless, Rothgery emphasized that attachment occurs “when the government has used the judicial machinery to signal a commitment to prosecute.” Id. at 211-12,128 S.Ct. at 2591,171 L.Ed.2d at 382. “Rothgery represents a triumph of formalism oyer functionalism,.,.” The Supreme .Court, 2007 Term — Leading Cases, 122 Harv. L. Rev. 276, 313 (2008).
B. Concerns in Lower Federal Case-law Regarding Bright-Line Attachment of Right to Counsel.
1. Introduction. Lower federal courts, of course, are bound to follow United States Supreme Court precedents. Jaffree v. Wallace, 705 F.2d 1526, 1532 (11th Cir.1983). Nonetheless, review of lower federal court precedents can fill in the gaps in Supreme Court precedent and illuminate important consequences in varied factual circumstances.
As a general proposition, lower federal courts, even after Kirby and Gouveia, remained divided on'whether there could be exceptions to the bright-line rule.' A number of cases from the United States Courts of Appeals for the First, Third, and Seventh Circuits seemed to recognize the possibility that the right to counsel might attach at some point other than arraignment in at least some circumstances. See Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 892 (3rd Cir.1999) (noting that the right to counsel may attach earlier when “the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by- both” (quoting Gouveia, 467 U.S. at 189,104 S.Ct. at 2298, 81 L.Ed.2d at 155)); Roberts v. Maine, 48 F.3d 1287, 1291 (1st Cir.1995) (“We recognize the possibility that the right to counsel might conceivably attach before any formal charges are made, or. before an indictment or arraignmént — ”); United States v. Larkin, 978 F.2d 964, 969 (7th Cir.1992) (observing that the defendant “may rebut this presumption [that right to *55 counsel did not attach at preindictment lineups] by demonstrating that, despite the absence of formal adversary judicial proceedings, ‘the government had crossed the constitutionally significant' divide from fact-finder to adversary’ ” (quoting United States ex rel. Hall v. Lane, 804 F.2d 79, 82 (7th Cir.1986))); see generally James S. Montana, Jr. & John A. Galotto, Right to Counsel: Courts Adhere to Bright-Line Limits, Crim. Just., Summer 2001, at 4, -6, 8 (summarizing lower court interpretations of Kirby and Gouveia).
A review of lower federal courts indicates there was particular concern with the Supreme Court’s inflexible bright-line approach to the attachment of the right to counsel in at least four contexts: plea bargaining, surreptitious interrogation, prefil-ing discovery, and prefiling lineups.[31]
2. Right to counsel in prefiling plea bargaining. A number of cases have expressed concern about the failure of the Kirby bright-line rule to provide for the assistance of counsel in cases in which the government engages in plea bargaining with an accused prior to the formal institution of judicial proceedings.
In United States v. Sikora, the United States Sixth Circuit Court of Appeals considered a case of a probationer who was suspected of continuing involvement'with drugs. 635 F.2d 1175, 1176 (6th Cir.1980) (Wiseman, J., concurring in part and dissenting in part). A DEA agent stated that they had enough evidence to indict and convict him and that cooperation would be in his best interest. Id. Eventually, Sikora made incriminating statements during the conversation with authorities. Id. The majority stated that no adversary proceedings had commenced against Sikora, and dismissed his appeal based on the admission of this evidence. Id. at 1775 (majority opinion).
A partial dissent,- however argued that the' right to counsel attached when the DEA agent discussed a plea agreement with Sikora even though there had been no formal charges filed. Id. at 1176 (Wise-man, J., concurring in part and dissenting in part). The dissent emphasized that “[tjhere should be no cause for. alarm at the prospect of potential criminal defendants enjoying Sixth Amendment rights during plea negotiations.” Id. at 1180. The dissent focused on language in Kirby and emphasized that under the facts of the case, “the government ha[d] committed itself to prosecute” and that “the adverse positions of the parties ha[d] solidified.” Id. at 1181, -
The approach of the dissent was followed in the post-Kirby case of Chrisco v. Shafran, 507 F.Supp. 1312 (D.Del.1981). In Chrisco, the district court found a right to counsel prior to the initiation of judicial proceedings where the government engaged in prefiling plea bargaining with the defendant. Id. at 1319. According to the district court,
[T]he fact that the government is willing to engage in plea bargaining is proof that the government has made a commitment to prosecute and that the adverse positions of the government and the defendant h'ave solidified in much the same manner as when formal charges are brought.... Recognizing the important role played by counsel in *56 plea bargaining, I conclude that there can be factual contexts in which the [S]ixth [A]mendment right to counsel attaches prior to the time formal criminal charges have been filed.
Id. On the facts, however, the court declined to find a right-to-counsel violation because the events leading up to Chrisco’s statements were “not true plea negotiations.” Id.
The Sixth Circuit returned to the issue of prefiling plea bargaining in a postcon-viction action. United States v. Moody, 206 F.3d 609, 610, 612 (6th Cir.2000). Moody claimed that he received ineffective assistance of counsel when his lawyer failed to properly advise him about a plea agreement offered by the government pri- or to the initiation of formal charges. Id. at 611-12. The government argued that there was no ineffective assistance of counsel because Moody’s right to counsel had not attached. Id. at 612. In the postcon-viction action, the district court below reversed, finding that the Sixth Amendment had attached. Id.
In Moody, the Sixth Circuit stated that the United States Supreme Court’s decision in Gouveia “foreclose^ the possibility that the right to counsel might under some circumstances attach prior to the formal initiation of judicial proceedings.” Id. at 613 (quoting Gouveia, 467 U.S. at 193, 104 S.Ct. at 2300, 81 L.Ed.2d at 157 (Stevens, J., concurring)). The Sixth Circuit recognized that Moody was faced “with an expert prosecutorial adversary” who was clearly committed “to proceed with prosecution.” Id. at 614. The Moody court emphasized that it was “a triumph of the letter over the spirit of the law to hold that Moody had no right to counsel .,. only because the government had not yet filed formal charges.” Id. at 616. Yet in light of the Sixth Circuit’s reading of Supreme Court precedent, the court, with obvious regret, found no right to counsel. Id. In a concurring opinion, Judge Wiseman urged the Supreme Court “to reconsider its bright line test for attachment of the Sixth Amendment right to counsel.” Id. at 618 (Wiseman, J., concurring). The Sixth Circuit has continued to express reservations regarding the Supreme Court’s bright-line approach. See Kennedy v. United States, 756 F.3d 492, 494 (6th Cir.2014); see also United States v. Wilson, 719 F.Supp.2d 1260, 1268 (D.Or.2010) (“Depriving a suspect-defendant of the effective assistance of counsel at pre-indictment plea negotiation ... may be more damaging than a denial of effective assistance at trial itself.”).
It seems to me that the prefiling plea bargain cases demonstrate either that Kirby’s bright line is either drawn in the wrong place or, alternatively, there must be exceptions to the bright-line rule to avoid sunburn when justice so requires.
3. Right to counsel for pretrial Massi-ah violations. Federal courts have occasionally shown discomfort with the bright-line approach of Kirby in the context of Massiah[32] violations. In DeAngelo v. Wainwright, the United States Eleventh Circuit Court of Appeals considered a pre-filing situation where police secretly recorded the defendant’s conversations. 781 F.2d 1516, 1517 (11th Cir.1986). Although no accusatory pleading had been filed, the court, citing Escobedo, noted that part of the conversation recorded was accusatory in nature and was designed to coerce a confession. Id. at 1519. The DeAngelo *57 court concluded that “[t]he conduct of the police in this case could qualify as an effort to circumvent DeAngelo’s [S]ixth and [F]ifth [Ajmendment rights after the police had decided to arrest him.” Id. at 1520. As a result, the court reversed and remanded the case to the district court for further fact-finding on this point. Id.
DeAngelo raises an interesting question: if the right to counsel exists only after judicial action, can a defendant in custody be subject to deliberate efforts by government agents to circumvent the right to counsel found in Massiah and its progeny?
4. Right to counsel at prefiling deposition. A third case of interest is United States v. Hayes, 231 F.3d 663 (9th Cir.2000) (en banc). By a 7-4 vote, the United States Court of Appeals for the Ninth Circuit concluded that the right to counsel did not attach even though the government had sought to obtain material witness depositions for use at defendant’s trial. Id. at 667. The majority stated that it was “somewhat queasy because it looks like the government is trying to have its cake and eat it too.” Id. at 675. The dissent attacked the majority for its “mechanical and formalistic approach,” which was “inadequate to evaluate, let alone preserve, the constitutional values at stake.” Id. at 680 (Reinhardt, J., dissenting). Although the analytic basis in the opinion is unclear, the court’s discomfort with Kirby seems palpable.
5. Right to counsel at prefiling lineup. In Hall, the defendant was imprisoned and awaiting trial for a case when prison officials told him he was required to participate in a lineup for a second, unrelated case. 804 F.2d at 80. Hall sought but was not allowed to talk to his attorney before the. lineup. Id. The witness identified Hall, and he was indicted, tried, and convicted. Id. In this habeas action, he challenged the failure of the state courts to suppress the identification as violating, his right to counsel. Id.
. The Hall court considered that a lineup is “fraught with the possibility of prejudice” and that the presence of counsel would be “a potent weapon in preventing prejudice.” Id. at 81. The court, however, said that in order for the right to attach, Hall would have had to prove thát it was a critical stage of the prosecution. Id. It explained that in its view, the Supreme Court had left open the question of what else may constitute the start of a prosecution sufficient to mark the attachment of the right of counsel. Id. at 82. The court declined, however, to find that a lineup would always cause the right to counsel to vest — rather, whether the right to counsel could attach would be a fact-specific inquiry into whether the role of the government had transformed “from fact-finder to adversary.” Id. In other words, the Hall court said, whether formally or not, if the suspect in fact “become[s] the accused,” then the right to counsel attaches. Id. at 83 (quoting Esco-bedo, 378 U.S. at 485, 84 S.Ct. at 1762, 12 L.Ed.2d at 983). On the facts before it, the court concluded Hall had failed to show that the prosecution had in fact begun, and so the identification was admissible. Id.
C. Caselaw from State Courts Regarding Attachment of Right to Counsel under State Constitutions.
■1. Introduction. It is ■ axiomatic, of course, that states may adopt a different approach to the right to counsel’ under their state constitutions. Many state courts have thus departed from United States Supreme Court decisions in the area of right to counsel in a wide variety of settings. See, e.g., Blue v. State, 558 P.2d 636, 642 (Alaska 1977) (holding there is a right to counsel under Alaska Constitution in preindictment lineup absent exigent cir-
*58 cumstances, contrary 'to Kirby)-, In re Johnson, 62 Cal.2d 325, 42 CaL.Rptr. 228, 398 P.2d 420, 422 (1965) (en banc) (noting under the California Constitution there is a right to counsel for all misdemeanor defendants); State v. Antone, 62 Haw. 346, 615 P.2d 101, 105 (1980) (adopting a. test for ineffective assistance more generous than Strickland v. Washington, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); People v. McCauley, 163 Ill.2d. 414, 206 IllDec. 671, 645 N.E.2d 923, 930, 933 (1994) (holding that a suspect cannot knowingly waive their right to counsel if the state does not tell the suspect that their- attorney is there and trying to reach the suspect); State v, Lawson, 296 Kan. 1084, 297 P.3d 1164, 1169, 1173 (2013) (rejecting Montejo v., Louisiana, 556 U.S. 778, 129 S.Ct. 2079, 173, L.Ed.2d 955 (2009), and holding that a defendant’s un-counseled plea of guilty is invalid unless the defendant first waived the right to counsel knowingly and intelligently); State v. Nordstrom, 331 N.W.2d 901, 904-05 (Minn.1983) (holding right to appointed counsel exists for all indigent misdemeanor defendants who may be imprisoned, not only those who actually are imprisoned); see generally Shirley S. Abrahamson, Criminal Law and State Constitutions': The Emergence of State Constitutional Law, 63 Tex. L. Rev. 1141, 1190-93 (1985) (summarizing state courts’ available avenues to depart from federal constitutional standards). We also have departed from established United States Supreme Court precedent-regarding the right to counsel recently in State v. Young, 863 N.W.2d 249,257 (Iowa 2015).
There have been two analytically related but distinct approaches to dealing with the problems arising from the Supreme Court’s bright-line approach. In some jurisdictions, courts have generally departed from arraignment as a bright line and instead move the line to another point, usually the point of arrest, which-provides more generous protection of the right to counsel. ' In a number of other jurisdictions, the bright line may not be moved, but it is subject to certain exceptions where a rigid application of the bright-line approach simply does not make sense.
2. Jurisdictions in which arrest generally triggers right to counsel. Shortly after Kirby was decided, a number of state courts declined to' apply the rule under their state constitutions. In People v. Jackson, the Michigan Supreme Court departed from Kirby; 391 Mich. 323, 217 N.W.2d 22, 27 (1974), overruled on other grounds by McDougall v. Schanz, 461 Mich. 15, 597 N.W.2d 148 (1999). The case involved photographic arrays and a lineup in an assault case. Id. at 23. Jackson relied on previous Michigan precedent noting that a suspect is entitled to counsel at a live or photographic lineup regardless of the judicial phase of prosecution. Id. at 27-28; see Neil Colman McCabe, The Right to a Laioyer at a Lineup: Support from State Courts and Experimental Psychology, 22 Ind. L. Rev. 905, 929-30 (1989) [hereinafter McCabe].
The Pennsylvania Supreme Court also refused to follow Kirby. In Commonwealth v. Richman, the Pennsylvania Supreme Court considered whéther the right to counsel under the Pennsylvania Constitution was violated when a lineup was held after a warrantless arrest. 458 Pa. 167, 320 A.2d 351, 352-53 (1974). The court concluded that' “[t]o allow uncounseled lineups between warrantless arrests and preliminary arraignment would only encourage abuse of the exigent circumstances exception and [undercut] our strong policy requiring warrants whenever feasible.” Id. at 354. A concurring opinion by Justice Eagan directly attacked Kirby. . Id. at 358 (Eagan, J., concurring). Justice Eagan declared,
*59 The artificial distinction drawn by the plurality in Kirby, between post-charge and pre-charge lineups is unwise and infringes upon the protections society should grant an accused. To force an accused to stand alone against the full force and investigative powers of organized society, until . he is actually charged with the commission of the crime, is an outrageous injustice.
Id. at 361.
A result similar to Rickman occurred in Bine, 558 P.2d at 641. In Blue, the Alaska Supreme Court noted that it was not limited by decisions of the United States Supreme Court when interpreting the Alaska Constitution. Id. Relying in part on Justice Brennan’s dissent in Kirby, the Blue court found a right to counsel for persons in custody unless exigent circumstances prevent it. Id. at 643. The court ultimately found that under the facts of that case, exigent circumstances were in fact present. Id.; see McCabe, 22 Ind. L. Rev. at 930.
Finally, in People v. Bustamante, the California Supreme Court found a right to counsel in preindictment lineups. 30 Cal.3d 88, 177 Cal.Rptr. 576, 634 P.2d 927, 935 (1981) (en banc), superseded on other grounds by constitutional amendment, Cal. Const, art. I, § 28(f)(2). Relying upon previous California precedent that cited Wade, the court emphasized the unreliability .of eyewitness identification and the extreme difficulty of reproducing the lineup procedure at trial. Id., 177 CaLRptr. 576, 634 P.2d at 933-34. As with Michigan and Alaska, the California court recognized that there could be exigent circumstances that might justify proceeding without counsel. Id, 177 CaLRptr. 576, 634 P.2d at 935; see McCabe, 22 Ind. L. Rev. at 930-31.
In short, there is ample coherent and logical authority for rejecting ■ the bright-line approach of Kirby under a state constitutional analysis.
3. Cases in which right to counsel is afforded in the context of implied consent. A number of other courts, however, have considered specifically "the 'question of whether the right to counsel attaches in situations where a defendant is confronted with a request for a chemical test under an implied-consent statute. In these jurisdictions, there has not necessarily been a wholesale rejection of Kirby, but- instead a recognition that the right to counsel may be present under some circumstances pri- or to the initiation of adversary judicial proceedings.
In one of the first cases, the New York Court of Appeals in 1968 considered whether the results of a chemical test were admissible after the denial of the defendant’s request to telephone a lawyer. People v. Gursey, 22 N.Y.2d 224, 292 N.Y.S.2d 416, 239 N.E.2d 351, 352 (1968). In Gursey, the New York court held that the defendant was entitled' to contact counsel unless it would unduly'interfere with the investigation. Id. Since the requested phone call could have been handled in a matter of minutes, the court held that the right to counsel was violated in that case. Id, 292 N.Y.S.2d 416, 239 N.E.2d at 353; see also People v. Rinaldi, 107 Misc.2d 916, .436 N.Y.S.2d 156, 157 (N.Y.Town Ct.1981),
The Vermont Supreme Court considered •the question in State v. Welch, 135 Vt. 316, 376 A.2d 351, 352 (1977). The court concluded that “the request to submit to a chemical test can rise to the level of a ‘critical stage’ in the proceedings.” Id. at 355. The court recognized what it characterized as “a limited right to counsel.” Id; see also State v. Welch, 136 Vt. 442, 394 A.2d 1115, 1116-17 (1978) (noting that the prior Welch-case did not hold that a suspect must be advised of his right to coun *60 sel but only that he must be allowed access to counsel if he requests it). Welch has been cited with approval in other Vermont cases relating to driving-related chemical tests but not involving claims of violations of the right to counsel, and it has not been overruled. See State v. Bonvie, 182 Vt. 216, 936 A.2d 1291, 1300 (2007) (describing the virtue of flexible standards for chemical tests as articulated in Welch); State v. Lund, 144 Vt. 171, 475 A.2d 1055, 1058 (1984), overruled on other grounds by State v. Begins, 148 Vt. 186, 531 A.2d 595 (1987).
The Oregon Supreme Court considered the matter in the post-Kirby case of State v. Spencer, 305 Or. 59, 750 P.2d 147, 147-48 (1988) (en banc). The Spencer court declared that
[a] person taken into formal .custody by the police on a potentially criminal charge is confronted with the full legal power of the state, regardless of whether a formal charge has been filed. Where such custody is complete, neither the lack of a selected charge nor the possibility that the police will think better of the entire matter changes the fact that the arrested person is, at that moment, ensnared in a “criminal prosecution.”
Id. at 155-56. The court recognized that the “evanescent nature of the evidence the police seek to obtain may justify substantially limiting the time in which the person may exercise his or her [state constitutional right to counsel], but it does not justify doing away with it.” Id. at 156; see also State v. Durbin, 335 Or. 183, 63 P.3d 576, 579 (2003). Further, in State v. Dinsmore, the Oregon Supreme Court noted that any telephone conversation should be private. 342 Or. 1, 147 P.3d 1146, 1150 (2006); see also State v. Riddle, 149 Or.App. 141, 941 P.2d 1079,1082 (1997).
The Washington Supreme Court considered the right to counsel in the context of an OWI arrest in State v. Fitzsimmons, 93 Wash.2d 436, 610 P.2d 893, 895 (1980) (en banc). After analyzing various eases, including United States Supreme Court precedents cited above, the Washington Supreme Court concluded that the-defendant was entitled to the assistance of counsel before deciding whether to submit to a chemical test. Id. at 901. The court, however, seemed to refer genetically to the right to counsel and did not clearly indicate whether the result in the case was based upon the United States Constitution or the Washington State Constitution. See id.
After the state sought certiorari, the Supreme Court vacated the decision and remanded the case. Washington v. Fitzsimmons, 449 U.S. 977, 101 S.Ct. 390, 66 L.Ed.2d 240 (1980). The remand order asked the Washington Supreme Court to clarify the basis of the result in the case. Id. On remand, the Washington Supreme Court noted that its holding was grounded in state as well as federal constitutional principles. State v. Fitzsimmons, 94 Wash.2d 858, 620 P.2d 999, 1001 (1980) (en banc). As a result, the court affirmed its prior opinion without change. Id.
The Minnesota Supreme Court confronted the issue of the right to counsel under the Minnesota Constitution in the context of a request for a chemical test in Friedman v. Commissioner of Public Safety, 473 N.W.2d 828, 829 (Minn.1991). In Friedman, the defendant was pulled over from the road for suspected OWI. Id. The Friedman court emphasized that the civil label assigned to informed-consent statutes was not determinative. Id. at 832. According to the court, OWI and informed-consent penalties are inextricably intertwined with criminal penalties. Id. at 833. In any case, the quasi-criminal conse *61 quences of revocation were very important to an individual driver. Id. The court concluded “the Minnesota Constitution protects the individual’s right to consult counsel when confronted with th[e] decision” to consent to a breath test. Id. at 833; see State v. Schmidt, 712 N.W.2d 530, 533 (Minn.2006) (noting that Friedman established that the Minnesota Constitution grants the right to counsel upon request when deciding to submit to chemical testing).
Many state courts, however, have found a right to counsel in .the context of a request for informed consent based on statute or rule — not their underlying state constitutions. See, e.g., Kameroff v. State, 926 P.2d 1174, 1178 (Alaska Ct.App.1996); McNutt v. Superior Ct., 133 Ariz. 7, 648 P.2d 122, 124 (1982) (en banc); Kuntz v. State Highway Comm’r, 405 N.W.2d 285, 289 (N.D.1987); Lakewood v. Waselenchuk, 94 Ohio App.3d 684, 641 N.E.2d 767, 770 (1994). Further, in jurisdictions in which the right to counsel attaches at the time of warrantless arrest, that right will also support the view that a person arrested and taken to the station for further testing is entitled to counsel. See Richman, 320 A.2d at 353.
D. Iowa Caselaw on Attachment of Right to Counsel. In a post -Kirby case, we applied the formalistic Kirby rule in State v. Jackson, 199 N.W.2d 102, 103 (Iowa 1972). In Jackson, the court applied the Kirby rule in the context of a pretrial identification. Id. There was no discussion of any claim under the Iowa Constitution. See id. In State v. Vietor, we recognized that there was a limited statutory right to the assistance of counsel. 261 N.W.2d 828, 831 (Iowa 1978); see also Fuller v. State, 275 N.W.2d 410, 411 (Iowa 1979). We did not find a violation of that limited statutory right in Vietor, however, based on the record then before us. 261 N.W.2d at 831.
Today’s plurality characterizes Vietor as rejecting “the argument the right to counsel under the Sixth Amendment had attached when the arrestee was asked to submit to the breathalyzer test.” This is not quite accurate. In Vietor, the defendant argued that his refusal to submit to the test should be inadmissible at trial because it violated his right to counsel under the Sixth Amendment. Id. at 830. We rejected this argument because the implied-consent statute made the refusal to submit to the test admissible and we had previously upheld this as constitutional. Id. This does not mean that we found that the right to counsel had not attached, but merely that no rule of exclusion could be applied under the Sixth Amendment to prohibit the introduction of evidence related to the refusal. In any event, Vietor was a Sixth Amendment case. Vietor did not involve article I, section 10 of the Iowa Constitution, which is the focus of this present litigation. See 261 N.W.2d at 830.
IV. Discussion.
A. Problems with the United States Supreme Court Bright-Line Attachment of Right to Counsel at Arraignment. As logic and caselaw demonstrate, there are a significant number of problems with an ironclad application of the bright-line approach of the United States Supreme Court that make it unwise for Iowa to adopt it. We should either move the bright line to the point of arrest or recognize that there are going to be exceptions to the general rule.
At the outset, there is an odd inconsis- ' tency between Fifth and Sixth Amendment rights. Fifth Amendment rights are triggered during custodial interrogation, but Sixth Amendment rights are not. But the relationship between the individual and the state becomes adversarial during custodial interrogation, not just for Fifth Amendment rights, but for the right to counsel as *62 well. At the point of custodial interrogation, there is a need for “a flow of information [to the individual] to help him calibrate his self-interest;” Arnold H. Loewy, The Supreme Court, Confessions, and Judicial ■ Schizophrenia, 44 ' San Diego L.Rev. 427, 428 (2007) (quoting Colorado v. Spring, 479 U.S. 564, 576, 107 S.Ct. 851, 859, 93 L.Ed.2d 954, 967 (1987)). If the custodial atmosphere is coercive for purposes of interrogation, why would it not be coercive in terms of providing informed consent? Does it not make sense, at a minimum, to move the generally applicable point of the right to counsel to the point of arrest?
Moreover, the' bright line of federal law is highly formalistic and causes' grave problems in some settings. It borde'rs on the absurd to suggest that, for instance, a pretrial lineup after arrest but prior to arraignment does not require the presence of counsel, but the very same lineup occurring one day afterwards does. Justice Brennan made this very same point in his dissent in Kirby almost fifty years ago.[33] 406 U.S. at 699, 92 S.Ct. at 1887, 32 L.Ed.2d at 423-24 (Brennan, J., dissenting). Yet, as noted by a leading commentator, the line drawn by Kirby “excluded most lineups from Wade’s protection, encouraged delay in the filing of charges, and drew a line that bore no rational relationship to the need for legal assistance.” Albert W; Alschuler, Failed Pragmatism: Reflections on the Burger Court, 100 Harv. L. Rev. 1436,1442 (1987).
Recent research on eyewitness identifications only tends to confirm how suggestive and potentially inaccurate early identifications cannot be undone by the time of trial.[34] Modern science now reinforces the notion that if eye-witness identifications through lineups or similar methods are to be used, the presence of counsel is essential if the right to a fair trial is to be preserved.[35]
For example, since the 1970s, psychological research has identified several areas where procedural suggestiveness can subtly influence witnesses to identify the suspect — these problems include pre-line-up instructions, the composition of the lineup, and the behavior of the official administering the lineup, in addition to other problems. See Gary L, Wells & Deah S. Quinlivan, Suggestive Eyewitness Identification Procedures and the Supreme Court’s Reliability Test in Light of Eye *63 witness Science: 30 Years Later, 33 Law & Hura. Behav. 1, 1, 6 (2009). Identifying some of these subtle cues and problems can be impossible to do after the fact, as these can be ephemeral events not recorded. in any way. Id. at 15-16. If the suspect has no right to counsel at these lineups, there will often be absolutely no indication that hidden suggestiveness has occurred,, let alone proof sufficient to strike the identification. Id. at 16.
There is no way to estimate how often procedural suggestiveness leads to witness misidentification, but of the people who have been exonerated ■ by new DNA' evidence after their convictions, seventy-five percent of their cases involved one or more eyewitnesses misidentifying the innocent suspect. Reevaluating Lineups: Why Witnesses Make Mistakes and Hoiv to Reduce the Chance of a Misidentification, Innocence Project (July 16, 2009), www. innocenceproject.org/reevaluating-lineups-why-witnesses-make-mistakes-and-how-to-reduce-the-chance-of-a-misidentification/. Decades of scientific research prove that the hazards of eyewitness identification described by the Wade Court as being beyond the ability of a suspect to detect are real. Wade, 388 U.S. at 228-32, 87 S.Ct. at 1933-35, 18 L.Ed.2d at 1158-60. A defense counsel’s presence at any lineup, whether it occurs prior to or after the initiation of formal proceedings against the defendant, is therefore vital to protect the defendant’s right to a fair trial. Cf. id. at 235, 87 S.Ct. at 1936-37, 18 L.Ed.2d at 1162 (“Thus in the present context, where so many variables and .pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself.”).
Further, the rise of forty-eight-hour holds in other jurisdictions — where an ar-restee is not subjected to judicial proceedings for up to forty-eight hours— demonstrates the potential flaws in stringent application of the bright-line approach in Kirby. Either the bright line must be moved to limit such irrationalities, or the bright line should be flexible enough to deal with situations where counsel is essential to preserve the trial rights of the defendant. Surely that is true in the case of informed consent, where once the client makes the decision, no lawyer, however skilled, can undo the consequences. The entire focus of Wade was protection of the right to a fair trial that can be irreparably affected by pretrial events. See id. The DeAngelo case highlights the possibility of manipulation and use of potentially inaccurate and un-counseled prefiling lineups to convict defendants. 781 F.2d at 1520.
• A further example of the problems of rigid application of a bright-line rule may be seen in the prefiling plea bargaining cases of the Sixth Circuit. Can the government enter into prefiling plea bargaining and cut a deal with a defendant without the assistance of counsel? That seems preposterous. Surely, if plea bargaining is going on, the adversarial positions have solidified and the state is likely represented by a trained professional.. Yet in Moody, the court held such plea bargaining was permissible, but it expressed significant discomfort. 206 F.3d at 615-16. If there is to be a bright line of some kind, it simply cannot allow prefiling plea bargaining without the assistance of counsel. Either the bright line gets moved to accommodate prefiling plea bargaining, or there must be an exception to the bright line to prevent the travesty of uncounseled plea bargaining.
B. Solid Footing of States Granting a Constitutional Right, to Counsel in the Implied-Consent Context.
*64 1. Overview of right to counsel. In reviewing the caselaw, there is a solid footing for the proposition that prior to making a decision on informed consent, the defendant is constitutionally entitled to the assistance of counsel under the “all criminal prosecutions” language of article I, section 10. While the sanctions for refusal to consent are civil, informed consent laws are inextricably bound with criminal law. The crucial stage of the process is not really at trial, but at the police station when the accused is confronted with the request to submit to testing. The encounter between police and the arrestee at the police station is hardly a friendly chat over coffee. It is a coercive encounter, usually in the dead of night. It is not a stretch to suggest that in these circumstances, to protect his right to effective assistance at trial, an accused is entitled to the help of counsel in determining what the evidence at trial will be. The caselaw in Vermont, Minnesota, Oregon, and Washington persuades me that the right to counsel should attach in this setting.
2. Question of entitlement to a private attorney-client consultation in context of implied consent. At this point, the real fighting issue in this case emerges. Does a driver facing an implied-consent request who invokes the right to call his lawyer have a right to engage in a discussion outside the earshot of the arresting deputy?
The Oregon Supreme Court has considered the question in two cases. In Dins-more, the Oregon Supreme Court held that any telephone conversation between a person from whom implied consent is invoked and his attorney should be private. 147 P.3d at 1150. The court reached a similar result in Durbin, 63 P.3d at 579.
Similarly, in State v. Powers, the Vermont Supreme Court noted that where an OWI defendant’s conversations were recorded, such a recording violated his statutory right to meaningful consultation with an attorney. 176 Vt. 444, 852 A.2d 605, 610 (2004). Although the Powers case deals with a statutory right, the analysis of “meaningful consultation” with counsel would seem to have equal force in the constitutional context. Id. at 611.
Yet the Minnesota Supreme Court reached a contrary result in Commissioner of Public Safety v. Campbell, 494 N.W.2d 268, 270 (Minn.1992). The Minnesota Supreme Court held that the telephonic right to legal advice before submitting to a chemical test need not be private. Id. According to the Minnesota Supreme Court, officers must be present in order to impeach any later testimony by an arres-tee who submits to testing that ingestion of something at the station might have affected test results. Id. Further, the court noted that to the extent any conversation was overheard, the remedy was suppression. Id. at 269-70.
Here, the State raises a similar concern to that touched upon in Campbell, namely that there is a possibility that a suspect could claim ingestion of some substance while engaged in a private telephone conversation with an attorney. I do not buy the argument.
First, it would be an extraordinary story for a defendant to claim that he was not intoxicated prior to the arrest, but that after the arrest and prior to the chemical test, he or she ingested more drugs or alcohol to go over the legal limit. No party has cited, nor have we found through the miracle of computer-based research, any reported cases where the strategy has been attempted, let alone succeeded. In any event, the same risk occurs when a lawyer physically meets with the client at the station house, a setting where the attorney and client have a statutory right to confidential communication. Thus, the *65 risk of ingestion of additional drugs or alcohol during a station-house visit by an attorney is the same as the risk that arises from a station-house phone call. There may, perhaps, be some circumstances where exigencies could require that a law enforcement officer be in the same room during an attorney-client conversation, but the burden would be on the State to show such an exigency. In this case, it failed to meet its burden.
V. Overview of Attachment of Right to Counsel Under the “Cases” Provision of the Iowa Constitution.
A. Introduction. The above analysis is based upon the “all criminal prosecutions” language in article I, section 10 of the Iowa Constitution. There is, however, an additional clause in the Iowa right-to-counsel provision not present in the federal counterpart. The “cases” clause plainly extends the right to counsel to matters beyond “criminal prosecutions.”
B. The “Cases” Clause of the Iowa Constitutional Right to Counsel.
1. Text. Article I, section 10 of the Iowa Constitution provides, “In all criminal prosecution, and in cases involving the life, or liberty of an individual the accused shall have a right ... to have the assistance of counsel.” Iowa Const, art. I, § 10 (emphasis added). The Iowa constitutional text stands in contrast to the Sixth Amendment, which provides merely, “In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel.... ”
The text of the federal right to counsel in the Sixth Amendment thus explicitly addresses only “criminal prosecutions,” while the Iowa Constitution expansively provides a right to counsel in a category beyond criminal prosecutions. Because of this notable and material difference, federal cases that focus solely on criminal prosecutions plainly have limited utility in serving as a guide for our independent interpretation of the Iowa Constitution. In any event, federal authority is only a guide, even in interpreting similarly worded provisions of the Iowa Constitution.
2. Historical background. The historical materials related to the adoption of article I, section 10 of the Iowa Constitution are quite limited. Further, it is a dubious enterprise to consider what the founders of the Iowa Constitution of 1857 would have thought about the right to counsel in the context of DataMasters and the drunk driving of planes, trains, or automobiles. Nonetheless, a survey of historical materials might give us some clues about the constitutional values behind the right to counsel that must be applied in our modern-day context.
One thing we know for sure: the majority of the Iowa founders of the Constitution of 1857 were not lock-step devotees of federal authority. See State v. Short, 851 N.W.2d 474, 483 (Iowa 2014) (“[T]here is powerful evidence that the Iowa constitutional generation did not believe that Iowa law should simply mirror federal court interpretations.”). Indeed, we know that at the Constitutional Convention of 1857, great concern was expressed over fugitive slaves.[36] The founders, in direct defiance *66 of the- Federal Fugitive Slave Act, enacted a design to slow the rendition of fugitive slaves in Iowa by providing them with jury trials and attendant procedural protections. James F, Wilson, later to receive considerable attention as chairman of the House Judiciary Committee during Reconstruction, stated on the floor of the convention. regarding the possibility of conflict between the state - right-to-counsel provision and the Fugitive Slave Act, “Gentlemen-may say that it will bring about; a conflict between the courts of the United States and the courts of this State.' Let that conflict come.... ” 2 The Debates of the Constitutional Convention of the State of Iowa 739. (W. Blair Lord rep., 1857) [hereinafter The Debates ], www.statelib raryoflowa.org/services/collections/law-library/iaconst.
So it appears that the founders were determined to provide a right to counsel for fugitive slaves. The United States Supreme Court was seen — correctly—as a tool of slavocracy, as demonstrated by the virtually unanimous and extraordinarily bitter denunciation by Iowa leaders’ of the Dred Scotf[37] decision, which was handed down by the Supreme Court just a few months after the adjournment of the 1857 constitutional convention. See 1 The Debates, at 137 (Showing the interest in Scott by the Iowa founders, who mentioned the then pending case during the debates); Anthony V.-'Baker, “The Authors of All Our Troubles The Press, the Supreme Court, and the Civil War, 8 J.S. Legal Hist. 29, 48 (2000) (describing Northern reactions to the Scott decision). Not'surprisingly, when South Carolina and Texas seceded from:the United States, they cited Iowa as among the states that were asserting states’ rights at the expense of federal power. The Declaration of Causes of Seceding States: Primary Sources, Civil War Trust, www.civilwar.org/education/ history/primarysources/declaration ofcauses.html (last visited June 23, 2016).
The founders must have been well aware of the determined defense offered to fugitive slaves in Iowa, including the services of lawyers ready to represent the'fugitives on a moment’s notice. Paul 'Finkelman, Fugitive Slaves, Midwestern Racial Tolerance, and the Value of “Justice Delayed”, 78 Iowa L. Rev. 89,122-28 (1992) (describing the efforts to help fugitive slaves' by abolitionists in Iowa); Indeed, when word spread of the seizure of a fugitive slave within Iowa’s borders, competent counsel invariably appeared to attempt to defeat the odious act of rendition of a fugitive slave who enjoyed freedom within our borders pursuant to a hated federal law, the Fugitive Slave Act. See id. at 126 (describing one such hearing, where a lawyer appeared to represent the fugitive slaves).
Cases brought under the Fugitive Slave Act, of course, were not criminal matters. *67 The founders clearly recognized that dramatic curtailment of life and liberty could also occur in civil proceedings such as actions under the Fugitive Slave Act.
There is nothing at all in the historical -record, however, -that suggests that the expanded language-was limited to fugitive slaves. Indeed, textualists. would have to concede that if the drafters’ purposes were to limit the expansion of the right to counsel to fugitive slaves, they would have used narrow language making that proposition explicit. To limit the broad language utilized amounts to amending the Iowa Constitution to meet contemporary policy goals.
As was noted many years ago by Justice Marshall in McCulloch v. Maryland, a constitution provides “great outlines,” and “we must never forget that it is a constitution we are expounding,” 17 U.S. (4 Wheat) 316, 407, 4 L.Ed. 579, 601-02 (1819). We have expressed similar views. In interpreting provisions of the Iowa Constitution, we should consider the words of Justice LeGrand some years ago:
[A] constitution is to be liberally construed, the principle has been developed that in framing a constitution, words are employed in a comprehensive sense as expression of general ideas rather than of finer shades of thought or of narrow distinctions, and ordinarily words in an instrument like the United States Constitution do not have a narrow, contracted meaning, but are presumed to have been used in a broad sense, with a view of covering all contingencies.... Stated differently, the rale is that no forced, unnatural, narrow, or technical construction should ever [be]- placed upon the language of a constitution.
Redmond v. Carter, 247 N.W.2d 268, 275 (Iowa 1976) (LeGrand, J., -concurring specially) (quoting 16 Am. Jur. 2d Constitutional Law § 76, at 258 (1964)). As we unanimously declared recently in Gansen v. Gansen, “It is well established that a broadly framed constitutional provision should not be narrowly interpreted in a fashion that limits its application to the specific mischief at hand.” 874 N.W.2d 617, 626 (Iowa 2016); see also State v. Newsom, 414 N.W.2d 354, 359 (Iowa 1987) (stating we broadly construe article I, section 10 of the Iowa Constitution “to effectuate its purpose”).
It would be odd to generously interpret the open-ended language of an Iowa constitutional provision related to agricultural leases while narrowly construing open-ended Iowa constitutional provisions related to the right to counsel. Indeed, constitutional interpretation involves taking general commands and applying them to specific cases, not using specific cases to narrow the scope of general commands. Further, as noted by the Supreme Court in United States v. Ash, the expansion of the right to counsel is necessary “when new contexts appear presenting the same dangers that gave birth initially to the right itself.” 413 U.S, 300, 311, 93 S.Ct. 2568, 2574, 37 L.Ed,2d 619, 627 (1973).
Because of the differences in text, it strains credulity to suggest that the “cases” clause is simply a redundant passage and that the federal caselaw under the “all criminal prosecutions” clause of the Sixth Amendment is applicable. Further, the effort to limit the extra verbiage in article I, section 10 to the matters of the Fugitive Slave Act is contrary to broadly accepted standards of constitutional interpretation that have, been embraced time and time again. . . ■
In fact, the fugitive-slave hypothetical is just an example of how the Iowa Constitution is different from the Federal Constitution when it comes to the right to counsel. Fugitive-slave cases were civil matters akin to extradition. Yet under the prevail *68 ing interpretation of the “all prosecutions” clause of the Sixth Amendment, such civil matters do not give rise to a right to counsel. Judd v. Vose, 813 F.2d 494, 497 (1st Cir.1987) (holding no right to a counsel attaches at an extradition hearing); McDonald v. Burrows, 731 F.2d 294, 297 (5th Cir.1984) (noting extradition is not a criminal proceeding, and so Sixth Amendment rights not implicated); Caltagirone v. Grant, 629 F.2d 739, 748 n. 19 (2nd Cir.1980) (noting that the Sixth Amendment applies only to criminal prosecutions and therefore not to an extradition); Saba-tier v. Dahrowski, 586 F.2d 866, 869 (1st Cir.1978) (holding no right to a speedy trial at extradition proceedings); Dunkin v. Lamb, 500 F.Supp. 184, 187 (D.Nev.1980) (noting extradition is not a critical stage of a criminal proceeding)..
Further, under the Iowa Constitution, basic rights are “inalienable.” Iowa Const, art. I, § 1. Such language is wholly absent from the Federal Constitution. The inclusion of this strong inalienability language is consistent with our state motto: “Our liberties we prize, and our rights we will maintain.” Neither the motto nor article I, section 1, has a qualifier that the rights are applicable “to the extent convenient.”
It seems to me, aside from the analysis of the “all criminal prosecutions” language, the “cases” clause provides ample footing for a right to counsel when implied consent is invoked. In this case, the suspect faces a critical stage that will dramatically affect the subsequent criminal trial and could well lead to revocation of his driver’s license for an extended period of time. A lawyer will be of little help once the die is cast at the time of the request for a chemical test. As a result, Senn is entitled to counsel under article I, section 10 of the Iowa Constitution.
VI. Conclusion.
For the above reasons, I would conclude that a right to counsel under article I, section 10 of the Iowa Constitution attaches when a suspect is confronted with an implied-consent request and that the request for a chemical test is a “critical stage” of the case. The opportunity to consult with counsel must be confidential absent a showing of exigent circumstance. That right, of course, is time limited so as to not impair the ability of the State to conduct appropriate testing upon consent. The refusal of the officer in this cáse to allow for a confidential communication requires suppression of the evidence in question.
Therefore, I would reverse.
WIGGINS and HECHT, JJ., join this dissent.

. A number of state courts also, though following Kirby, expressed concern about application of the rule. For example, a.Missouri appellate court.noted that the bright-line approach in Kirby made little sense, noting that "[o]nce [the defendant] has been identified by the victim, pre-informational or post-informational, to a large extent he has had his trial.” State v. Gray, 503 S.W.2d 457, 460 (Mo.Ct.App.1973); see Note, The State Responses to Kirby v. United States, 1975 Wash. U.L.Q. 423,436-41.

, Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246, 250 (1964) (holding that an indicted person released on bail was denied his Sixth Amendment rights when federal agents had deliberately elicited information from him in the absence of counsel).

, Academic commentary ' after Kirby was largely unfavorable; See Joseph D, Grano, Kirby, Biggers, & Ash: Do Any Constitutional Safeguards Remdin Against the Danger of Convicting the Innocent?, 72 Mich, L, Rev. 717, 72S-30 (1974) (noting that Kirby created a new and previously unsupported limitation on the right to counsel); McCabe, 22 Ind. L. Rev. at 907 (describing how in light of Kirby, police can be expected to hold lineups prior to the initiation of formal'adversarial proceedings in order to benefit from the absence of defense counsel).

. Gary L. Wells & Deah S, Quinlivan, Suggestive Eyewitness Identification • Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later, 33 Law & Hum. Behav. 1, 5-6 (2009); see also ■ Kevin Krug, The Relationship Between Confidence and Accuracy: Current Thoughts of • the Literature and a New Area of Research, 3 Applied Psychol. Crim. Just. 7, 17-31 (2007); Gary L. Wells, Applied Eyewitness-Testimony Research: System Variables and Estimator Variables, 36 J; Personality Soc. Psychol. 1546, 1548-55 (1978); Daniel B. Wright & Anne T. McDaid, Comparing System and Estimator Variables Using Data from Real LineUps, 10 Applied Cognitive Psychol, 75, 75-81 (1996).

.In the alternative, at least one state supreme court has held that improperly structured identification procedures may be subject to challenge under the due process clause of the applicable state constitution. See State v. Henderson, 208 N.J. 208, 27 A.3d 872, 918-19, 919 n. 10(2011).

. At the debates, George W. Ells stated, “I regard the Fugitive Slave Law as unconstitutional, because it does not give to man the right to defend his life and liberty by 'due process of law.’ ” 1 The Debates of the Constitutional Convention of the State of Iowa 101 (1857) [hereinafter The Debates], www. statelibraryofio wa. org/services/ collections /law-library-iaconst. J. A. Parvin stated, “And this affords a good illustration of the evils growing out of the fugitive slave law, which the present democratic party would carry into every territory of the United States.” 2 The Debates at 708. Rufus L. B. Clark stated, "It is a libel upon the English language to call [the Fugitive Slave Law] a law.... [The Fugi *66 tive Slave Law] will never be effectual until man obtains the power to repeal the laws of nature and of nature’s God.” Id. at 717. Amos Harris stated,
[T]heré is a provision in the constitution of the United Stales that provides for the return of ... fugitive slaves- This provision in our [state] constitution would prevent any person from being removed unless he first, had a jury trial here* I undertake to say that he cannot have a jury trial here, for simple reasons_
... [This]- would be equivalent to saying at once, that any slave in the territory of this state shall have the right to assert his freedom and cannot be remanded back into slavery.
Id. at 736.

. Scott v. Sandford, 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1857) (holding in an infamous antebellum case that Dred Scott, who ■ fled slavery in Missouri, could not sue for his freedom in Illinois), superseded by constitutional amendment, U.S. Const, amends, XIII, XIV.